UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

FAYE FEINSTEIN, RECEIVER FOR
WML GRYPHON FUND LLC,

        Plaintiff,

v.                                                   Case No. 11-C-57

DENNIS LONG, et al.,

        Defendants.

---

FAYE FEINSTEIN, RECEIVER FOR
WML GRYPHON FUND LLC,

        Plaintiff,

v.                                                     Case No. 11-C-58

BRIAN W. BENDER, et al.,

        Defendants.

---

## DECISION AND ORDER

---

       In the above-captioned actions, Faye Feinstein, as receiver for the WML Gryphon Fund LLC, seeks to "claw back" money invested in the fund from two family trusts that made redemption requests in January 2008 and received their full or partial redemptions over a period of months ending in April 2009. This Court's jurisdiction is predicated on 28 U.S.C. §§ 754 and 1367(a). Both cases are before the Court on the defendants' motions to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The defendants argue that the receiver lacks

standing to assert any of the claims, that the allegations of the complaint are legally insufficient, and that the claims sounding in fraud are not stated with the required particularity. For the reasons given below, the motions will be granted.

**I. BACKGROUND**

Both cases arise out of the disastrous investments made by Wealth Management LLC, an Appleton company that had, on paper, roughly $130 million under management at the time the receiver was appointed in 2009. The WML Gryphon Fund was one of several LLCs created and managed by Wealth Management. Significant investors in the fund included the revocable trusts of the Long and Bender families, the defendants here. The Gryphon investment vehicle invested customers' money in life insurance proceeds and real estate, as opposed to more sound investments suitable for most of Wealth Management's customers. Among other things, this prompted the SEC to begin investigating Wealth Management's operations and ultimately, in 2009, it requested the appointment of a receiver. (*See* Case No. 09-C-506.)

In that enforcement case, certain investors who had made distribution requests argued that they should receive priority over the other investors because upon making their distribution requests they had actually become creditors of the fund, whereas the other investors, who had not made such requests, merely held equity positions. But this Court rejected that argument, and the Seventh Circuit affirmed. Ultimately, all investors who had not received money were treated as equity investors, even if they had made distribution requests prior to the appointment of the receiver in 2009.

The investors who objected to the receiver's plan in the enforcement action received only a small portion of their redemption request because by February 2008 the fund had informed all investors that they would be limited to redemptions of just two percent of their investment, per quarter, as a result of the fund's inability to meet liquidity requirements and distribution requests. Thus, even though many investors requested full distributions, the fund did not honor those requests.

The present action involves two investors who requested distributions *before* February 2008, when the fund informed investors that they would be limited to very minor withdrawals. Dennis Long, whose family trust invested nearly $5 million in Gryphon, became concerned in December 2007 after Wealth Management informed investors that the returns for a real estate fund held by Gryphon would have to be restated.[1] On December 17, 2007, Long met with Wealth Management's Simone Fevola to inquire about a restatement of real estate earnings that the company had announced two weeks earlier. (Compl., Ex. B at 51.) In another meeting three weeks later, Long asked for compensation due to the restatement (Wealth Management officers refused his request) and then stated that he would be demanding a full redemption of his shares. (Compl., Ex. B. at 52.) The next day, January 5, 2008, Long submitted a written redemption request. Long later wrote a letter to James Putman, Wealth Management's CEO, in which he explained that his withdrawal was based on frustration with Wealth Management's strategy and investment decisions.

---

[1] Both motions to dismiss involve matters outside the pleadings, which is atypical for a motion to dismiss. The receiver has objected, stating that she would be prejudiced by an inability to respond to the defendants' factual assertions. Although there are indeed facts at issue here outside the pleadings, they merely add context and are not material to the outcome.

Investment vehicles like Gryphon often invest in illiquid assets that cannot readily be converted into cash at the request of the investor, particularly a large investor. (This is why many such funds have withdrawal restrictions.) Gryphon's inability to pay Long was acute, and it informed Long that it would have to pay him his redemption over time. In February, Putman offered Long the option of back-dating his redemption request to December 31, 2007 (5 days prior to his actual written request). This would allow Long to be "out" of the fund sooner but would also mean he would not participate in any upside the fund might enjoy for the rest of the first quarter. It would also mean he would not have to worry about reporting taxes for 2008. Even so, Putman explained to Long that the fund was having liquidity issues and was in talks with other entities to help solve those problems. "Hopefully we will get this thing done so you can get your cash out as soon as possible," Putman said. (Compl., Ex. B. at 66.) Long opted for the back-dated effective date. Although Long received some of his investment back in March 2008, the majority of it (more than $4 million) was paid out between July 2008 and April 2009.

The two trusts owned by the Bender family, which had invested some $1.4 million in Gryphon, followed a similar path. Brian Bender met with a Wealth Management officer named Lori Coonen on January 9, 2008 – within a week of Dennis Long's meeting. In the meeting he expressed his concern about the restatement of earnings for the fund's real estate investments and asked for redemption forms. Coonen explained to Bender that his redemption would be effective at the end of the quarter (i.e., March 31, 2008) under the terms of the fund's operating agreement. Wealth Management received Bender's full redemption request on January 14, 2008. As with Long, however, the redemption request was back-dated to be effective December 31, 2007. Similarly,

although the Bender trusts received some money right away, the bulk of their investment was not returned until January and April 2009. This Court appointed the receiver in May 2009.

By February 15, 2008, it became clear to Wealth Management officials that Gryphon was having liquidity issues and that Putman was unable to obtain sufficient liquidity to pay out other redemptions. Wealth Management sent a letter to Gryphon investors saying that there was not enough liquidity to pay redemptions in full and that redemptions would be limited to two percent per quarter of the value of each individual's investment. The letter, in fact, attempted to reassure investors that the liquidity problem was not a *value* problem and noted that fund managers fully expected annual returns to be in-line with expectations. (Stippich Decl., Ex. E.) It further explained that investors who had already made redemption requests "would be treated equally as liquidity becomes available," meaning that they would be treated equally based on what quarter they redeemed their investment but implying that they were not subject to the two-percent restriction being imposed. (*Id.*) Things got much worse during the rest of 2008, as they did in most other investments worldwide. By December 2008, investors received a letter indicating that redemptions would be suspended altogether and that the Gryphon fund was liquidating entirely. The letter hinted, and the receiver has now confirmed, that the remaining assets were far lower than what investors' statements estimated. In fact, the receiver notes that the funds paid out to the two Defendants are more than what was left to be divided among the other 98 investors in Gryphon.

## II. ANALYSIS

The complaints bring six claims. Counts one and three allege intentional and constructive fraudulent transfer, respectively, in violation of Wis. Stat. §§ 242.01(1)(a), 242.05(1) and

5

242.07(1)(a). Count two alleges unjust enrichment. Counts four and five assert unauthorized and wrongful distributions, in violation of Wis. Stat. §§ 183.0905(3) and 183.0608. Finally, count six alleges aiding and abetting the breach of a fiduciary duty.

Although the defendants have asserted various grounds in support of their motions to dismiss each count of the respective complaints, I find their threshold argument that the receiver lacks the authority or standing to bring the present action dispositive. In support of that argument, the defendants note that under state law, a receiver stands in the shoes of the company and has no greater rights than the company itself would have had. This is reflected in the order appointing the receiver, which gave the receiver control of all Wealth Management funds and the right to sue on the funds' (but not investors') behalf. It further allows her to provide for the equitable distribution of the funds' assets to investors. Here, Gryphon (the receivership entity) would not have had any right, contractual or statutory, to claw back distributions properly made under the terms of the operating agreement. Once a distribution is paid, Gryphon has no further relationship with a former investor. Here, all of the funds were paid to the defendants before the receiver was appointed, and thus they are not assets of Wealth Management subject to the receiver's equitable distribution powers. Moreover, the distributions were made pursuant to the fund's operating agreement, and thus the company would not have had any basis to claw the money back. Accordingly, because Gryphon would have had no right to the defendants' funds itself, and because the order appointing the receiver does not grant the power to go after funds that are not assets of Wealth Management or its funds, the defendants argue that a claw back would exceed the receiver's authority. *Scholes v. Lehmann,* 56 F.3d 750, 753 (7th Cir. 1995) ("an equity receiver may sue only to redress injuries to the entity in receivership, corresponding to the debtor in bankruptcy and the corporation of which

6

the plaintiffs are shareholders in the derivative suit.") *Javitch v. First Union Sec, Inc.,* 315 F.3d 619, 625 (6th Cir. 2003) ("Because they stand in the shoes of the entity in receivership, receivers have been found to lack standing to bring suit unless the receivership entity could have brought the same action.") (citations omitted).

The *Scholes* case has been cited at length by all parties. There, a man named Douglas operated a Ponzi scheme. The court appointed a receiver over his company, and the receiver brought claims against Douglas himself and a number of people who had received money from Douglas, including his ex-wife and an investor who actually profited by getting out early. These parties objected to the receiver's authority to bring the lawsuit, suggesting that the receiver was really acting on behalf of the other investors rather than the company in receivership itself. The Seventh Circuit recognized that if the receiver were merely acting on behalf of the other investors, he would be exceeding his authority. But the court concluded that he was, in fact, acting on behalf of the corporation. By virtue of the Ponzi scheme, Douglas had harmed the corporation itself by diverting its assets to his ex-wife and others, and thus the receiver could pursue claims that would recoup corporate assets (even though the investors were the obvious beneficiaries of the receiver's efforts).

*Scholes* stands for the principle that a claim based on defrauding other investors is for those investors – not a receiver – to pursue. The receiver represents the interests of the company in receivership. Naturally, the investors in that company stand to benefit (as in *Scholes*) if the receiver can return assets to the company. But ultimately the receiver's job is to acquire assets that properly belong to the company itself, not to pursue claims based on alleged damage to other fellow investors. As the district court in *Scholes* put it:

7

> Fraud on investors that damages those *investors* is for those *investors* to pursue-not the receiver. By contrast, fraud on the *receivership entity* that operates to *its* damage is for the *receiver* to pursue (and to the extent that investors as the holders of equity interests in the entity may ultimately benefit from such pursuit, that does not alter the proposition that the receiver is the proper party to enforce the claim).

*Scholes v. Schroeder,* 744 F. Supp. 1419, 1422 (N.D. Ill. 1990).

This distinction is explored at some length in an unpublished Sixth Circuit case which, coincidentally (or not), also involved a failed fund that invested in life insurance proceeds. In *Liberte Capital Group, LLC v. Capwill,* the court was faced with a battle between individual defrauded investors who wanted to pursue their own claims against broker-dealers, and the appointed receiver, who wanted to pursue those claims on behalf of all investors. 248 Fed. Appx. 650 (6th Cir. 2007). The district court ordered that the receivers "are empowered to represent and pursue the interests of investors directly in keeping with the ultimate goal of maximizing the Estates for their benefit." *Id.* at 653. Thus, in the dispute between certain individual investors and the receiver, the district court agreed with the receiver that the fraud claims of individual investors belonged to the receivership estate rather than those investors personally.

The Sixth Circuit reversed. It concluded that the claims were really personal claims belonging to the individual investors and were outside the scope of the receivership, despite the district court's broad grant of receivership powers. The court found that "when a receiver is appointed over a corporation, the receiver may only assert claims that could have been asserted by the corporation, and the receiver lacks standing to institute action on behalf of investors in the corporation." *Id.* at 6. The claims the investors sought to make were against broker-dealers, and the company in receivership would have had no claim against those defendants. As the Sixth Circuit put it in a subsequent appeal, "The Receiver's standing problem in *Liberte* was that none of

8

the receivership entities—VES, CFL, Capwill or Liberte—would have had standing to sue Liberte's brokers for the misrepresentations the brokers made to Liberte's investors, because none of the entities would have been able to claim any tangible injury traceable to the brokers' misrepresentations to the investors. Because the receivership entities all would have lacked standing, and because of the rule that receivers' rights are limited to those of the receivership entities, the Receiver also lacked standing." *Wuliger v. Manufacturers Life Ins. Co.,* 567 F.3d 787, 794 (6th Cir. 2009).

In *Wuliger,* one of many iterations of the failed life insurance investment funds at issue in *Liberte*, the receiver sought rescission of the life insurance policies and return of the premiums on the ground the policies were fraudulently procured. The defendant insurer argued that the receiver lacked standing because he had conceded in his complaint that he was acting for the ultimate benefit of Liberte's investors. The district court and Sixth Circuit disagreed, finding that the receiver was merely acknowledging the obvious truth that a company's investors are the beneficiaries when assets are recovered in the company's name. *Id.* at 795. Because the receiver's claims could in fact have been brought by one of the receivership entities, the receiver had standing even though he acknowledged that the true parties in interest were the investors.

> In contrast to the Receiver's attempt to sue Liberte's brokers for their misrepresentations to Liberte's investors [in *Liberte, supra*], the Receiver in this case has standing to sue MLIC because at least one of the receivership entities, Liberte, would have standing to bring such an action. First, the Receiver alleges that Liberte suffered an injury in fact: that it paid the premiums on an unenforceable policy, thereby receiving no consideration for its payments. Liberte's alleged injury is fairly traceable to the actions of MLIC, which was informed of the fraud and refused to pay the premiums back. The injury can be redressed by a court order requiring MLIC to return the payments. With respect to prudential considerations, Liberte would be asserting its own rights to recoup the insurance premiums it paid to MLIC,

9

and as the owner and assignee of the policyholders' rights under the contract, it is the only entity in privity of contract with MLIC.

*Id.* at 794-95.[2]

Following the cases cited above, the ultimate question is whether the receiver is actually acting on behalf of Gryphon or whether the claims she has brought are essentially investor claims. Put another way, the question is whether Gryphon *itself* was harmed. I conclude that because Gryphon was not injured by treating the defendants' redemption requests as it did, the receiver is not stating any claims on behalf of the receivership entity. Accordingly, the complaint will be dismissed.

It might be helpful to begin by highlighting what this case is *not*. Most importantly, although Gryphon was an investment vehicle that lost a fortune and whose managers may have been receiving kickbacks, it was not a Ponzi scheme. That is, the investments may have been poor; they may have been ill-suited to those investing in them; and the managers may have been acting improperly. But even though the investments ultimately failed, they were not an illusion. The investments were *real*. This contrasts with how the *Scholes* court found that the receivership company in that Ponzi scheme case had been injured:

> The corporations, Douglas's robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties. They received money from unsuspecting, if perhaps greedy and foolish, investors. That money should have been used for the stated purpose of the corporations' sale of interests in the limited partnerships, which was to trade commodities. Instead Douglas caused the corporations to pay out the money they received to himself, his ex-wife, his favorite charities, and an investor, Phillips, whom Douglas wanted to keep happy, no doubt in the hope that Phillips would invest more money in the Ponzi scheme or encourage

---

[2] Even though the Court held that the receiver had standing to sue, the Court ultimately concluded that the receiver was barred from recovering the premiums already paid because of Liberte's unclean hands. 567 F.3d at 797-98.

> others to do so. . . . <u>The three sets of transfers removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations.</u>

56 F.3d at 754 (emphasis added).

Thus, because the company in *Scholes* was actually harmed by the unauthorized use of its funds, the receiver had standing to sue on its behalf. In short, in a Ponzi scheme the corporation itself is hurt in addition to its investors because the corporation's purpose was not to foster illegal distributions of its assets (even though its principal directed it to do so). Here, by contrast, the transfers made to the Long and Bender trusts were *authorized,* and thus unlike in *Scholes* it cannot be said that the Gryphon entity was harmed. It should go without saying that there is nothing untoward, much less illegal, about paying individuals back their investment as well as their actual profit (in Long's case). Moreover, the operating agreement governing Gryphon did not prohibit the disbursements either. In particular, although Section 5 of the agreement provides general rules on when investors must make withdrawal requests, it also provides that such rules apply "unless the Managing Member consents (which consent may be granted or withheld in its sole and absolute discretion) to a deviation from one or more of such procedures." (Stippich Decl., Ex. A at 5.1) This flexibility is echoed in § 7.1.11, which indicates that Wealth Management had the ability to waive "any notice period . . . or other limitation or restriction imposed on capital contributions or withdrawals of capital . . . regardless of whether such notice period, minimum amount, limitation . . . operates for the benefit of the Company, the Managing Member or fewer than all the Members." (*Id.* at § 7.1.11.)

The receiver appears to concede that she must show that the company was defrauded in some way, and she focuses on Putnam's back-dating of the disbursement requests, which she

suggests was fraudulent. (Recall that Long and Bender wanted out in early January 2008, but their requests were made effective on December 31, 2007). But there are at least two problems with this argument. First, the back-dating was immaterial to the Defendants' ability to get their money out early. Under the broad powers granted to the Managing Member, the Managing Member could have waived all time and procedural requirements (in its "sole and absolute discretion") and authorized a withdrawal on the *same day* the investors demanded their money. For example, the operating agreement would have allowed Putman to honor Long's redemption request on January 5, when it was made. If he could have found liquidity, he could have simply paid Long and Bender right away, regardless of any back-dating. Thus, although there were tax and investment reasons for back-dating the request to December 31, the difference of five days made no difference for *redemption* purposes because the operating agreement allowed Putman to waive any of the standard deadlines for redemption requests, and that is what he did. Whether the request was "effective" on December 31, 2007 or January 5, 2008, the operating agreement allowed Wealth Management to pay the redemption requests immediately.

In addition, it should be clear that even if the back-dating was somehow instrumental in the Long and Binder trusts receiving their money early, the operating agreement explicitly allowed such a result. As noted above, the agreement allowed Wealth Management to waive any deadlines for redemption requests. This meant that a request made on January 5 could be deemed effective on the same day, or whenever Wealth Management saw fit. Moreover, under the terms of the operating agreement, Wealth Management did not have to treat all investors the same way, a point all investors agreed to. Wealth Management had the ability to waive "any notice period . . . or other limitation or restriction imposed on capital contributions or withdrawals of capital . . . *regardless*

12

*of whether such notice period, minimum amount, limitation . . . operates for the benefit of the Company, the Managing Member or fewer than all the Members.*" (Stippich Decl., Ex. A at § 7.1.11.) Thus, the company was governed under an arrangement that allowed it to waive notice periods, regardless of the effect it might have on the company itself or the other members. This is, in effect, what it did. In essence, Wealth Management determined a cut-off date, based on the fund's liquidity, and endeavored to fully honor the redemptions of investors who had demanded their money before that date. Long and Bender made their requests more than a full month before the company limited withdrawals on February 15, 2008, and that is the key distinction between them and the other investors. Instead of treating Long and Binder's redemption requests as effective March 31, as it *could* have done, it viewed them as effective immediately and began paying them in March.

My conclusion would be different, of course, if the receiver could demonstrate that back-dating the redemption requests defrauded the company in some way. Suppose, for example, that an investor wanted "out" in March when it was obvious that the economy was headed south and the fund's investments were declining rapidly. If the manager back-dated a redemption request that allowed that investor to receive a redemption based on his balance for the *previous* quarter, then of course that would amount to a form of theft: the company's manager would be improperly diverting the company's assets to compensate a single investor for his losses. Here, the receiver is not alleging that the trusts profited by being allowed to back-date their requests by a matter of days. The investments did not collapse during the first five or ten days of January, when the redemptions were made, and thus there is no suggestion that the trusts received more than they should have on that account. Instead, the argument is that the trusts should have been lumped in with all the other

13

investors who wanted to redeem in the first quarter of 2008. The company could have taken that approach. But by taking another approach, one it was authorized to take, it was not defrauded.

Although it is conceivable that other investors in the fund might have some sort of claims against the Long and Binder trusts, Gryphon itself has none. The claims brought by the receiver are all based on fraud, unauthorized transactions, unjust enrichment and the like. By exercising the authority granted them by the operating agreement governing the fund, Putman and other Wealth Management officials were not defrauding or otherwise improperly diverting Gryphon assets. Ultimately, the fact that Gryphon's managers treated investors who wanted out in January better than those who requested disbursements after February 15, 2008 did not harm *Gryphon* in the least. Either way, unlike a Ponzi scheme, the company was simply paying out funds – legitimate funds – to investors.

## III. Conclusion

Because I conclude that the receiver is not bringing claims on behalf of the company in receivership, the motions to dismiss in both cases are **GRANTED**. The defendants' motions to file oversized reply briefs, the receiver's motions to file sur-replies, and the SEC's motion to file a response brief are also **GRANTED**. The Clerk is directed to enter judgment in favor of the defendants dismissing the actions with prejudice.

**SO ORDERED** this   10th   day of August, 2011.

                                                            s/ William C. Griesbach
                                                          William C. Griesbach
                                                          United States District Judge